IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

RACHEL PARRA,                                    Civ. No. 05-6385-HO

               Plaintiff,                ORDER

     v.

HOUSING AND COMMUNITY SERVICE
AGENCY OF LANE COUNTY, et al.,

               Defendants.


     Plaintiff works as a receptionist for defendant Housing and

Community Service Agency of Lane County, Oregon (HACSA).

Defendants are Lane County, HACSA, the executive director of

HACSA, and plaintiff's former supervisors.  The second amended

complaint contains federal and state statutory employment

discrimination claims, Section 1983 claims, and state common law

claims for intentional and reckless infliction of emotional

distress and wrongful discharge.  Defendants filed a motion for

summary judgment on all claims in the second amended complaint.

Plaintiff filed a motion to strike arbitration decisions relied

upon by defendants.

The arbitration decisions are not inadmissible as plaintiff contends.  <u>Alexander v. Gardner-Denver Co.</u>, 415 U.S. 36, 60 (1974).  The motion to strike is denied.

The motion for summary judgment is granted in part and denied in part.  Disputed issues of fact exist as to whether HACSA subjected plaintiff to disparate treatment based on her race by preventing her transfer from the receptionist position. The remaining claims are untimely, unsupported by sufficient evidence to survive summary judgment, or fail to state claims upon which relief may be granted.

<u>Factual Background</u>

The following facts are undisputed, not reasonably susceptible to dispute, or gleaned from plaintiff's evidence. Plaintiff Rachel Parra is an Hispanic person of Mexican national origin.  In October 2000, HACSA hired plaintiff as a temporary front desk receptionist at its Day Island office in Eugene, Oregon.  Plaintiff successfully applied for the permanent front desk position on or about January 2, 2001.  Plaintiff represented on her applications that she holds a bachelor of arts degree and a real estate license.  Plaintiff does not hold such a degree or license.  Defendant Jill Fields supervised plaintiff's employment at Day Island.  Geni Sustello supervises Fields.

Fields decided to extend plaintiff's initial probationary

2 - ORDER

period from June 7, 2001, to August 7, 2001, for plaintiff's
alleged tardiness, personal phone calls and issues concerning
client communications.  The probationary period is extended for
five to ten percent of new hires.  During the period of extended
probation, plaintiff's personal telephone calls were to be
limited in duration to one or two minutes, and plaintiff's family
would not be allowed in the office lobby between 4:00 and 4:30PM.
Fields and Sustello had no concerns regarding plaintiff's family,
however.  No other employees were subjected to these limitations.
In a June 21, 2001 memorandum, Fields rescinded the extended
probationary period.  The memorandum notes "cooperation with the
request from Union."

Fields issued a written reprimand to plaintiff dated
February 14, 2003, for quality of customer service and
untruthfulness.  In an award dated September 13, 2003, an
arbitrator reduced this discipline to an oral warning.  HACSA did
not register the arbitration award in plaintiff's personnel file
until approximately one year after the date of the award.

HACSA placed plaintiff on a work plan covering the period
April 7, 2003, through June 16, 2003.  The plan states that
improvement is needed in the areas of quality of work, customer
service, dependability, business ethics and planning and
organization.  The plan provided, _inter alia_, that plaintiff is
to arrive at work on time and take care of personal business,

such as getting coffee or greeting co-workers, before the scheduled start time.

During a June 2, 2003 meeting concerning plaintiff's work plan, Fields denied disclosing the work plan to other employees. On June 3, 2003, Fields told union steward Beth Elliker that she had forgotten that she had disclosed the plan to Jennifer Larson.

According to a June 13, 2003 memorandum, Fields contacted HACSA Deputy Director Larry Abel on May 30, 2003, with allegations that plaintiff manipulated data in HACSA's "computer-generated Section 8 waiting list." Pl's ex. 38. Abel authorized Thomas Brett to conduct an investigation. Id. According to Brett's September 29, 2003 preliminary report, Abel requested the investigation on June 2, 2003. During the investigation, Brett told interview subjects they were not under investigation.

Plaintiff took medical leave for work related stress on June 5, 2003. Plaintiff's medical provider released her to return to work on September 3, 2003. On that day, HACSA placed plaintiff on administrative leave, with pay, pending the results of the Brett investigation.

In a July 2, 2003 memorandum regarding the "S8 Investigation," Intake Coordinator Don Bucholtz provided Geni Sustello with "background information on the Section 8 names you submitted through Jill Fields." Bucholtz's memorandum provides that plaintiff's name is associated with the address of Section 8

4 - ORDER

applicant Justin Regg Rodriguez.

Brett's report states that during the investigation, Sustello contacted Melanie Meashintubby to investigate a report that plaintiff offered to "'bump [her] to the top' [of the Section 8 waiting list] like she had for [plaintiff's] brother . . ."  Pl's ex. 23 at 12.  The report further states that Meashintubby signed a written statement to this effect, plaintiff said Meashintubby misunderstood plaintiff, Meashintubby failed to return Brett's inquiries, and Meashintubby told the person who originally disclosed her conversation with plaintiff that Meashintubby was very angry that Brett tried to contact her.  Id. at 12-13.  The report does not disclose the identify of the person that disclosed Meashintubby's conversation with plaintiff.

Under the heading "misconduct discovered during investigation," Brett's report lists untruthfulness during the investigative interview, falsification of applications for initial employment and promotion, and misuse of HACSA telephones for personal business.  Pl's ex. 23 at 2.  Under the heading "investigative conclusions," Brett opines that two allegations that plaintiff changed "head of household" applicant information are sustained, and that there is clear evidence that plaintiff knew or should have known she was not allowed to change the information.  Pl's ex. 23 at 11-12.  Brett further opined that while it is clear that someone with access to HACSA computerized

records made inappropriate entries regarding the application of
plaintiff's brother, the allegation that plaintiff did so is not
sustained, for lack of proof.  <u>Id</u>. at 12.

Plaintiff's attorney submitted a letter dated August 18,
2003 to Lane County Commissioners, Lane County Counsel and HACSA
Executive Director Chris Todis.  The letter states that plaintiff
"has been subjected to ongoing and continuing harassment,
retaliation and discrimination[,]" and "[t]here exists a hostile
work place, based upon . . . race and national origin," at HACSA,
and that management failed to take corrective action despite
prior notice of the claim.  Pl's ex. 35.

The letter further states that the harassment and hostility
"began shortly after January 2001 and consists of numerous and
sometimes daily incidents, including but not limited to the
following recitation of facts."  <u>Id</u>.

> In April of 2001, a note was left for [plaintiff] at
> her work station advising her to "speak English in
> America."  Within the first few months on the job, co-
> workers' actions towards [plaintiff] and her ensuing
> complaints resulted in the implementation of an "anti-
> mobbing" policy.  At the subsequent training on the
> policy, in June of 2001, management heard one of their
> employees state that "anyone who gets mobbed asks for
> it."  Management took no direct action to end the
> harassment or hostility.  Shortly thereafter, a sign
> with a picture of a pig holding a mop with the caption
> "No mopping" was left on the copy machine and pointed
> out to [plaintiff] by the person making the copy.
> [Plaintiff] then saw copies of the sign posted around
> the building in common areas and within personal office
> space of others.  [Plaintiff] pulled down signs posted
> in the hallway but at least one sign, in the office of
> a co-worker who was actively involved in the mobbing

6 - ORDER

action, remained up for months.  A supervisor was seen
to sit for an extended period of time on [sic] that
office and failed to instruct the employee to remove
the sign.

In May of 2001, [plaintiff] was told that her family
could not come to the work place, despite the fact that
families of other employees were not so barred.
Confidential details of [plaintiff's] probationary
status were made known to at least one of the co-
workers known to be actively engaged in the "mobbing"
behavior and that employee disclosed to [plaintiff]
that she had that information.

In September of 2001, one of [plaintiff's] supervisors,
Jill Fields, told her she would not consider
[plaintiff's] application for an in-house temporary
promotion because she has to be at the front desk for
at least one year.  This assertion is contrary to any
policy and practice of HACSA.  A white employee was
promoted off the front desk within weeks of her hire.

In January of 2002, [plaintiff] again asked to apply
for a new position within the organization.  Fields
stated that Mexican people need to see a "brown face"
when they come in to HACSA and that [plaintiff] should
not apply for the new position.  [Plaintiff] was told
she would lose her Spanish language pay enhancement if
she applied.

In preparation for a training session in April of 2002,
a co-worker submitted a training scenario to the group
stating: "a person of color is not pulling their weight
and the supervisor does nothing for fear of the
employee playing the race card," knowing that
[plaintiff] was the only person of color employed by
HACSA participating in the training.  Management took
no direct action to end the harassment and hostility.

In September of 2002 [plaintiff] was instructed to do
temporary work in an advanced position but was denied
out of class pay even though a white co-worker was
given out of class pay for doing the same work.
[Plaintiff] complained to supervisor [Geni] Sustello
when a co-worker in the temporary position told
[plaintiff] that she was not allowed to sit in the same
room as her to do her work, even though it was a
designated work station.  Sustello responded by telling

[plaintiff] to be thick skinned about unpleasant comments from co-workers and took no direct action to end the harassment and hostility.  This was the same employee who had earlier made a statement that anyone who gets mobbed deserves it.

In November of 2002, when [plaintiff] returned from a vacation, she found her photographs of her children which she kept on her desk had each been laid face down.  A co-worker reported to [plaintiff] that she overheard the offending co-worker state she did not want to have to look at "those" children.  When she complained to supervisor Sustello, [plaintiff] was told that the supervisors was aware of what's going on but could not do anything to prevent it.

With this prior history, Management continued to permit [plaintiff] to be subject to harassment, discrimination, and hostility in the workplace. Management's inaction continued such that on February 21 of 2003, a written reprimand was issued to [plaintiff] for an inadvertent mistake, even though other employees make inadvertent mistakes and are not subject to written reprimands.  The Union grieved this matter stating that [plaintiff] was subject to disparate treatment.  The matter is pending in arbitration.

On February 28, 2003, HACSA management met with [plaintiff], her Union representative, and legal counsel, to discuss [plaintiff's] concerns of harassment and hostile work place.  At that meeting, supervisor Jill Fields made statements indicating her belief that [plaintiff] is responsible for her problems and did not offer to take action to end the harassment and hostility.

In late May and early June of 2003, supervisor Fields put [plaintiff] on another work plan and disclosed the existence and contents of the work plan to co-workers who had no reason or right to know this information. Some of these co-workers were known to be actively involved in the mobbing actions against [plaintiff]. When confronted with this disclosure, Fields first denied that she had done so but eventually admitted it was true.  She took no action to end the harassment and hostility generated by this action.

> In retaliation, HACSA has instigated an investigation
> in [plaintiff] regarding matters which were not at
> issue until after [plaintiff] retained the services of
> an attorney and filed a complaint with BOLI to oppose
> the ongoing harassment and hostile work environment.
> Under the guise of this investigation, supervisor
> Sustello contacted members of [plaintiff's] church,
> claiming to work for an attorney's office, and asking
> questions about [plaintiff].

Pl's ex. 35.

Plaintiff testified to several matters referenced in her attorney's letter. First, Jennifer Larson and another co-worker told plaintiff that Becky MacKenzie and Kim Lucas turned over pictures on plaintiff's desk while plaintiff was on vacation. Plaintiff reported the incidents to Sustello, who told her to have a thick skin. Plaintiff is aware of no other investigation or discipline. Plaintiff did not speak to MacKenzie or Lucas about the pictures because she was too upset. Plaintiff was the only front desk person. Other employees have photographs in their work spaces.

Second, Sustello and Fields told plaintiff she could not apply for positions away from the front desk, while Anita Kochis and Jennifer Larson were promoted without submitting applications. Fields told plaintiff that Sustello said plaintiff would lose preference pay for speaking Spanish if she applied for an office assistant position away from the front desk. Jane Griffin and Christine Champ translate for clients even though they do not hold the front desk position.

9 - ORDER

Third, in response to plaintiff's inquiry about a position away from the front desk, Fields told plaintiff that brown peopled needed to see a brown face.  Fields brought plaintiff a bilingual job application and asked plaintiff if she knew anybody who wanted to apply.  The application was for another agency. Plaintiff does not know what Fields meant to suggest by giving her the application.

Fourth, Fields told plaintiff that a group of two or three women, including Kim Lucas, "was going to break [plaintiff][,]" and that "[t]hey did it to everybody."  Fields meant that two or three Hispanic ladies that previously held plaintiff's position either quit or were fired because they didn't fit in.

Fifth, fifty or sixty of the signs making fun of the mobbing training were placed all over the office.

Sixth, Fields told plaintiff that under agency policy, the extended period of probation and work plan were confidential. However, Becky MacKenzie told plaintiff that plaintiff could not contribute to the office assistant's fund because her probation was extended.  And Jennifer Larson told plaintiff she could not help plaintiff with her files, because plaintiff's performance was monitored under a work plan.  Plaintiff reported the disclosures to a union steward.  Larry Abel said the disclosures were accidental.

Seventh, plaintiff believes that her race motivated the

10 - ORDER

extended probation and work plans because of Fields's comment
that brown people need to see a brown face, and because she was
treated differently than everybody else.  Plaintiff's family
could not be in the lobby, even though plaintiff's family visited
the lobby infrequently.  The families of other employees
frequently visited the lobby.

Eighth, HACSA made no follow up or closure to investigator
Brett's preliminary report.  HACSA simply transferred plaintiff
to the Fairview office and told her not to discuss the
investigation.  HACSA did not restrict other employees from
discussing the investigation.  Plaintiff considers the
investigation to be biased, because any of twenty employees could
have manipulated the Section 8 data.  Subjects were told they
were not under investigation.

Last, Sustello contacted a member of plaintiff's church,
Delecia Meashintubby, posed as an attorney, told Meashintubby
that plaintiff was terminated for bumping people up on the
waiting list, and asked Meashintubby to give a statement.  Fields
and Sustello asked Delecia's daughter Melanie if plaintiff bumped
people up the waiting list.  Melanie Meashintubby cares for
Fields's grandsons.

Plaintiff also testified that at the Day Island office, a
co-worker referred to a biracial baby as a "little chocolate
baby," that plaintiff reported the comment to Fields, and that

plaintiff was not notified of any action taken in response to her report of this incident.

Jennifer Larson documented an August 19, 2003 conversation with Jill Fields in a written statement.  Larson wrote that the union asked that she be interviewed in an August 20, 2003 arbitration, and that Fields told Larson she didn't understand why Larson needed to be interviewed.  Larson further stated that Fields said, "I know you are rallying for [plaintiff], but I still don't understand why you need to be there[,]" and "as long as you call a spade a spade everything should be just fine."

Deputy Director Abel testified that based on Brett's preliminary report, HACSA decided not to discipline plaintiff.  Therefore, HACSA decided not to pay Brett to complete a final report.

Becky Mackenzie, a Caucasian, complained that plaintiff spread rumors that Mackenzie posted signs saying Mackenzie should win a union election against plaintiff because Mackenzie has light skin, red hair and blue eyes.  Fields testified that the sign said "something along the lines of 'vote for Becky MacKenzie.  She's running for union secretary.  She's hard-working, trustworthy, and she has red hair."  ECF/CM [#84] ("Attachment 5 to the Declaration of Counsel," Fields Depo. at 81:15-18).

Day Island income analyst Jane Griffin testified that she

12 - ORDER

moved to that position from the receptionist position.  According to Griffin, employees thought the anti-mobbing policy was "stupid," the training was tiresome, and plaintiff brought mobbing on herself.  Griffin further stated that plaintiff may have heard her say that people should speak English in America, but she didn't make this statement to plaintiff, because plaintiff speaks English.  Griffin said she created a campaign poster for Becky MacKenzie with the words, "[v]ote for Becky for union secretary[;] [s]he's smart, capable, dependable, trustworthy, and a redhead."  Pl's ex. 6.

Becky MacKenzie testified that she complained to Fields about plaintiff's excessive phone use and tardiness, and that she documented plaintiff's tardiness because it was so frequent.  MacKenzie submitted a written complaint that plaintiff was spreading rumors of some type of campaign or comment that MacKenzie should win the election because of her red hair, light skin and blue eyes.

Sustello testified that plaintiff was required to take a Spanish competency test when she was hired, and that she assumes plaintiff passed the test.  She further testified that she witnessed plaintiff's family in the office, and that she had no concerns with how frequently her family was in the office.  Sustello further stated that either plaintiff or someone else told Sustello that there had been statements that individuals

13 - ORDER

that were mobbed deserved to be mobbed.  Sustello said she discussed the "no mopping" sign with Griffin, but did not reprimand Griffin for keeping the sign on Griffin's office door. Sustello said she assumes that during a pre-investigation meeting, she told Brett of a comment made by Fields's stepdaughter about plaintiff's relationship to Regg Rodriguez. Though she investigated, Sustello said she did not determine who tipped over pictures on plaintiff's desk.  Sustello stated that plaintiff asked about other jobs within the office assistant team.  She further stated, "we hired her for the receptionist as a bilingual, and . . . made it perfectly clear at the time . . . that that's where we wanted her."  Sustello stated that there have been numerous people on the office assistant team who have been promoted over the years.  Sustello stated that Fields told her that a conversation took place in which Fields said something that implied that plaintiff was on a work plan.

Executive Director Todis testified that at the time plaintiff was hired, he "thought it was important that we had somebody who could speak Hispanic [sic] at the front desk."

On October 20, 2003, HACSA returned plaintiff to work in the position of office assistant receptionist at its Fairview office in Springfield, Oregon.

Abel testified that he and Todis decided to return plaintiff to work at the Fairview office because it would have been very

disruptive and uncomfortable for plaintiff and some employees at the Day Island office if plaintiff were to return to work there.

Plaintiff received the same pay and benefits at the Fairview office as she received at the Day Island office. John Demboski is plaintiff's supervisor at the Fairview office. Don Williams was Demboski's supervisor at relevant times.

On January 8, 2004, plaintiff received a reprimand from Demboski for providing incorrect educational information on her application, and for refusing to provide information explaining the incorrect information.

Plaintiff's position requires high school equivalency and basic clerical skills.

On August 6, 2004, Larry Abel asked Linda Norris of Norris Consulting Group, Inc. to investigate allegations and complaints by plaintiff beginning on July 16, 2004, including the following: (1) plaintiff's July 16, 2004 complaint to Demboski that coworker Don Bucholtz referred to a male Latino client as plaintiff's boyfriend; (2) plaintiff's July 16, 2004 complaint to Demboski that Bucholtz stated that plaintiff would never be promoted; (3) plaintiff's July 16, 2004 complaint to Demboski that a person made a comment derisive of African-Americans; (4) plaintiff's July 20, 2004 e-mail to Demboski asking him to take into account certain factors in response to Demboski's July 19, 2004 e-mail concerning the status of plaintiff's work; (5) plaintiff's July

30, 2004 complaints to Demboski that co-worker Norma Riggs accused plaintiff of tracking Riggs's break time, wrote on plaintiff's desk calender and said a curse word to plaintiff; (6) plaintiff's August 3, 2004 request for a meeting with Williams and Demboski regarding alleged harassment, defamation of character, and abuse by Riggs, staff comments that plaintiff is a victim of domestic abuse, and tracking of plaintiff's break time by Riggs and coworker Nicole Stone; (7) plaintiff's August 5, 2004 complaint to Demboski regarding rumors of a statement plaintiff allegedly made about the wording on Becky MacKenzie's campaign poster and rumors that plaintiff was suing HACSA; (8) plaintiff's August 6, 2004 complaint to Demboski that Kathy Jensen made a derogatory statement about plaintiff to Jennifer Larson; and (9) plaintiff's August 16, 2004 statement to Demboski regarding plaintiff's BOLI/EEOC complaint.

The following findings, among others, appear in Norris's September 7, 2004 report. Bucholtz stated that he intended his boyfriend comment to be humorous, consistent with a previous comment by plaintiff about Bucholtz. Def's ex. B at 8. Demboski counseled Bucholtz on the day plaintiff reported his comment. Bucholtz provided a written apology to plaintiff and agreed not to repeat the incident. Id. at 42. Bucholtz denied stating that plaintiff will never get promoted, and there is no evidence corroborating plaintiff's complaint that he said so. Id. at 10.

16 - ORDER

Plaintiff did not tell Demboski the identity of the person who she claimed made a derogatory remark about African Americans, or whether the person was an employee.  Id. at 11.  "There is evidence that concerns about the quality of plaintiff's work are related to work errors, attendance and time spent at work on personal phone calls."  Id. at 16.  "There was no evidence that the work quality concerns are related to preconceived notions employees might have had about [plaintiff] when she transferred to the Fairview site."  Id.

Riggs coordinates work at the front desk.  Id. at 44.  Riggs and Stone cover the front desk when plaintiff is away from the desk.  "There was no evidence that Demboski's . . .e-mail . . . about work issues  . . . had any connection to [plaintiff's] complaint about Bucholtz."  Id. at 17.  Riggs began searching the front desk discarded envelope recycle bin, recycle box and trash for missing rent checks after a December 2003 staff meeting.  Id. at 42.  Riggs appears to search plaintiff's trash can and recycle box more often than necessary, which has created tension between Riggs and plaintiff.  Id.  Riggs, described by supervisors as a person who can be overzealous, had similar conflicts about her working style with plaintiff's predecessor, who was not a member of a minority group.  Id. at 24, 44.  Riggs was counseled about softening her approach with staff.  Id. at 24.  Riggs's responsibilities for coordinating front desk work were taken away

for a period of time, and restored when Demboski began work at Fairview in 2003. Id. at 44. Riggs's assumption that plaintiff was tracking Riggs's break times was reasonable, though her reaction to plaintiff was inappropriate. Id. Riggs's supervisor counseled Riggs about her reaction and directed her to bring problems with plaintiff to his attention, rather than confront plaintiff directly. Id. The work relationship between plaintiff and Riggs is strained by plaintiff reportedly making statements to other employees that she is going to get HACSA to fire Riggs and other employees. Id. at 43.

Plaintiff, Riggs and Bucholtz shared information about Bucholtz's comment with other employees. Id. at 42. There is no evidence the three were told to keep the information confidential. Id. The work environment at Fairview appears to be one in which employees talk openly with each other. Id.

Stone said she tracked plaintiff's breaks because she was concerned about the additional time she spent covering the front desk, and that plaintiff's attendance issues were not resolved. Id. at 43. Stone tracked plaintiff's time away from the front desk at least as early as November 3, 2003. Id. at 21. Beginning as early as November 7, 2003, Demboski counseled plaintiff regarding the impropriety of skipping breaks or combining breaks and meal periods, tardiness, the need for punctuality, and time keeping. Id. at 43. Stone was directed to

18 - ORDER

stop tracking plaintiff's breaks on August 10, 2004.  Id.

During her interview with Norris, plaintiff denied complaining about rumors regarding what she said about Becky MacKenzie's campaign poster.  Id. at 34.  There is evidence that plaintiff told employees Huffman and Stone that she is suing HACSA, and that employees Hunt, Dean and Stone asked plaintiff what happened to her at the Day Island Office.  Id. at 35.  There is no evidence that employees spread rumors about plaintiff suing HACSA.  Id.

Jensen admitted commenting to Larson that staff have to be careful about what they say around the front desk because of how plaintiff interprets things.  Jensen denied referring to plaintiff as "psycho."  Id. at 38.  Larson is positive Jensen used this word.  "Jensen reports that she became concerned about having conversations in front of [plaintiff] after Riggs told Jensen about [plaintiff's] complaint against Bucholtz."  Id.

High timeliness and attendance expectations for the receptionist position are reasonable, because the position must be covered continuously.  Id. at 40.

Plaintiff provided evidence of incidents at the Fairview office not addressed in the Norris report.  Bucholtz became upset about errors in a Hispanic person's application, shoved the application in plaintiff's face and told plaintiff to "learn to translate English."  Demboski testified that Bucholtz was

19 - ORDER

frustrated in attempting to illustrate a point about how the application had not been correctly completed, Bucholtz acted inappropriately, and Demboski made a statement to Bucholtz like, "don't do that."

At a division meeting, Williams told a joke with the punchline, "you've seen Juan, you've seen Amal."  Williams testified that the joke is a pun, he likes to tell jokes he considers "groaners," he does not believe the joke had racial connotations, and he doesn't have "a racist bone in [his] body." Williams further testified that when it was determined that a terminally-ill resident housing manager would die soon, the manager was permitted to stay HACSA controlled housing.  Williams also testified that LCC students go to the head of the line for housing at the Village Oaks location.  When plaintiff complained to Williams that people were talking about her being physically abused, Williams told plaintiff there was a positive to it, in that people were concerned about her.  Williams did not offer to take action on plaintiff's behalf.

Plaintiff had a disagreement with Demboski regarding her timecard.  Plaintiff reported the problem to Larry Abel, who agreed with her position.

Demboski investigated and prepared a report dated July 21, 2004, regarding plaintiff's allegations that Bucholtz referred to a male Latino client as plaintiff's boyfriend, provides a lesser

quality of service to Latino males, and commented that plaintiff will never get promoted.  Pl's ex. 17.

By e-mail dated August 3, 2004, plaintiff requested a meeting with Don Williams, John Demboski, Beth Elliker and Norma Riggs for a continuing problem with "harassment and defamation of character" by Riggs.

Abel investigated Becky MacKenzie's August 5, 2004 report that plaintiff violated the anti-mobbing policy by making statements to other employees that MacKenzie's union election campaign posters are racist.  Abel concluded in a September 10, 2004 memorandum as follows: two flyers were posted; no one could produce a copy of the flyers; both flyers referenced MacKenzie being a redhead; there appears not to have been a reference to skin color; and plaintiff inappropriately characterized the flyer as racist to other employees, though she did not violate the anti-mobbing policy with this one-time incident.

On August 20, 2004, Union Steward Beth Elliker sent an e-mail to Todis and Abel complaining that plaintiff's personnel file contained a February 2003 written reprimand, in violation of an arbitrator's April 13, 2003 award reducing the discipline to an oral reprimand.

On September 7, 2004, plaintiff sent an e-mail to Demboski, Williams, Elliker and Chuck Hauk, complaining that a calender/photograph of United States Treasury Secretary Ana

21 - ORDER

Escobedo-Cabral was removed from the wall in plaintiff's work area without plaintiff's permission.  The e-mail documents the following: plaintiff learned about the removal of the calender on September 7, 2004; plaintiff spoke with Demboski about the matter; Demboski said he would find out who removed the calender and get back to plaintiff with a name and resolution; there was no resolution after the first time plaintiff reported the incident; and plaintiff feels that the lack of resolution "sent out a message that this behavior was condoned and acceptable." Demboski issued an oral reprimand to Riggs for removing the calender.

Bucholtz testified that he was interviewed by a woman who did not inform him that his conduct or treatment of plaintiff was under investigation.  Bucholtz further testified that he observed plaintiff many times violating the agency's incidental use policy with personal telephone use, and that he violated the policy two or three times.  He further testified that Riggs told him that Riggs told plaintiff, "[i]f you stay off the fucking phone, you could get your work done[,]" that Riggs reported the incident to Demboski, and that Riggs's profane comment was precipitated by plaintiff's request to Riggs for help with front desk duties.

Norris helped develop a performance improvement plan for plaintiff, and met with plaintiff and Demboski regarding the plan on September 22, 2004.  The plan required improved performance in

application, file, mail and payment processing, customer service and absences.  Plaintiff grieved the plan.  An arbitrator upheld the plan after striking information in the plan documenting past absences and tardiness.

Plaintiff took medical leave on November 3, 2004.

In January 2005, an e-mail circulated around the work place. The e-mail contained a multiple choice test, with the words "Muslim male extremists between the ages of 17 and 40" as the answer to each question.  Plaintiff states she was offended by this e-mail.

Plaintiff was released to return to work on February 10, 2005.  HACSA again placed plaintiff on paid administrative leave on February 11, 2005, pending a due process meeting to determine whether plaintiff's employment should be terminated for charges that she wrongly told a client and the client's probation officer that the client's application was cancelled, stated that such cancellations "happen a lot around here to Blacks and Latinos," provided the client with contact information for a county commissioner, and advised the client to contact the commissioner. Demboski interviewed the probation officer and an HACSA employee witness about the incident.  At Todis's request, Demboski did not interview plaintiff prior to the due process meeting.  Demboski also did not interview the client.

On February 18, 2005, plaintiff attended the due process

23 - ORDER

meeting concerning the February 11, 2005 charges.  Plaintiff's
union lawyer and union steward also attended.  On the advise of
the lawyer, plaintiff did not provide a response to the charges.
HACSA terminated plaintiff's employment.  Plaintiff filed a
grievance.  In an award dated November 7, 2005, an arbitrator
found that HACSA had just cause to discipline plaintiff for
communicating erroneous information to a client, and for
disparaging the agency.  The arbitrator found termination to be
excessive discipline, and reduced the termination to a ten-day
suspension without pay.

     In a declaration filed in this court, Yvette Mills-Jensen
provided the following version of events.  Mills-Jensen went to
the HACSA office on February 18, 2005 to check on the status of
her housing application.[1]  Plaintiff looked up the application on
a computer and informed Mills-Jensen she was no longer on the
housing list.  Mills-Jensen became upset.  Parole Officer Sue
Beal came out of her office and looked at the computer screen
with plaintiff.  There were notes on the computer regarding
Mills-Jensen's criminal background.  Mills-Jensen was extremely
upset and plaintiff did everything possible to calm her down.
Plaintiff suggested that Mills-Jensen reapply for housing as soon
as possible and that she contact County Commissioner Bobby Green.

_____

     [1]The date appears to be erroneous, as Mills-Jensen's
declaration seems to recount a version of the events of February
11, 2005.

24 - ORDER

Beal took Mills-Jensen into Demboski's office.  Mills-Jensen left the office believing that the mistake would be taken care of and her name would be returned to the housing list.  She later received a voicemail from HACSA stating the problem had been resolved and she was back on the housing list.  HACSA did not contact Mills-Jensen to give a statement.  Plaintiff was helpful and professional and did not make any inappropriate comments or comments about race during Mills-Jensen's conversation with plaintiff.

Demboski issued a "Memorandum of Expectations for Return to Work" for plaintiff, dated November 21, 2005.  The memorandum addresses expectations in the areas of work performance, customer service and productivity, timeliness and attendance, and conduct in the workplace.  Pl's ex. 22.

Plaintiff filed the declaration of Marisela Pena, HACSA office assistant-receptionist.  Pena states she observed plaintiff being treated differently than other employees, as follows.  Other employees make and receive personal telephone calls, but only plaintiff is monitored.  Other employees, including Pena, come to work late, but only plaintiff is monitored consistently.  A couple of employees "constantly take sick leave" and are not required to provide doctor's notes.  However, plaintiff must provide proof of her absences with doctor's notes.  On Administrative Day, plaintiff's co-worker

received a gift, but plaintiff did not.  Pena complained to
management about the disparate treatment of plaintiff, but no
action has been taken to remedy the situation.

Plaintiff filed a complaint with the Oregon Bureau of Labor
and Industries (BOLI) on June 23, 2003.  Plaintiff alleged that
since October 2000, her employer discriminated against her in the
terms and conditions of her employment because of her race, she
was subjected to hostile or offensive remarks from "White
employees", such as references to people of color as "chocolate,"
and she was disciplined for behavior for which White employees
did not receive discipline.  She further alleged that when she
complained about hostile or offensive behavior of coworkers,
HACSA failed to take prompt and effective action to investigate
and stop unlawful discrimination.  :She further alleged that
HACSA fails to make reasonable efforts to prevent discrimination
because of race.  By "right to sue letter" dated June 14, 2004,
BOLI informed plaintiff that it dismissed her complaint because
it did not find sufficient evidence to continue its
investigation.  The United States Equal Employment Opportunity
Commission adopted BOLI's findings in a "right to sue letter"
dated July 8, 2004.

Plaintiff filed a second complaint with the EEOC on
September 29, 2004.  The complaint alleged discrimination based
on race, national origin and retaliation occurring since

26 - ORDER

September 14, 2004.  In particular, plaintiff alleged she is
subjected to harassment, discrimination and retaliation that
creates a hostile work environment, including, but not limited to
the following actions.

> The employer failed to act effectively when a flyer was
> issued during a union election that endorsed my
> opponent because of her light skin, eye color and red
> hair.  Instead, I was investigated and disciplined for
> making false accusations of racist behavior.  The
> employer refused to comply with an arbitration decision
> instructing them to remove derogatory information from
> my personnel file.  The employer permits a co-worker to
> monitor my arrival and departure times form my work
> station and to report them to my supervisor.  The
> employer falsely accused me of moving a friend's and
> family members names up on the waiting list for a
> housing vacancy improperly.  Management contacted a
> friend who was not even registered to be on the waiting
> list.  The employer violated their own rules by
> improperly advancing an injured employee toward the top
> of the waiting list.  The employer failed to take
> effective action toward the intake coordinator after he
> repeated and incorrectly referred to an Hispanic
> applicant for services as my "boyfriend" and the
> employer failed to take effective action to prevent co-
> workers from repeatedly violating my work space by
> turning over family photos and moving personal
> belongings reflecting my Hispanic heritage.  In
> addition, I am previously and am currently performing
> the work of jobs for which employees are paid at a
> higher rate than I receive.

Def's ex. 32.  The EEOC issued a right to sue letter on September
22, 2005.  The EEOC was unable to conclude that the information
obtained establishes violations of statutes.

Among the bases for plaintiff's claims against defendant
Sustello is that Sustello told plaintiff to be thick skinned and
asked plaintiff why Sustello's daughter was fired from a health

club owned by plaintiff's friend.

Among the bases for plaintiff's claims against defendant Todis is that Todis stated in arbitration that plaintiff was a bureaucrat who played the race card.

Plaintiff filed the original complaint in this case on December 20, 2005.

Plaintiff remains employed at the Fairfield office.

<u>Discussion</u>

Summary judgment is appropriate if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

I.  <u>Race, Color and National Origin Discrimination Claims</u>

Plaintiff's first claim under Title VII and fourth claim under Section 659A.030 of the Oregon Revised Statutes each contain three counts alleging race and national origin discrimination, retaliation for opposing race and national origin discrimination, and hostile work environment race and national origin discrimination.  Plaintiff's second claim under 42 U.S.C. § 1981 contains substantially similar allegations that HACSA discriminated and retaliated against plaintiff on the basis of color, race and national origin.

A.  Limitations Periods

1.  Title VII

Defendants first argue that nothing that happened at the Day

28 - ORDER

Island office is actionable under Title VII, because plaintiff failed to sue for this conduct within 90 days of receiving "right to sue letters" from on June 14 and July 8, 2004.  Plaintiff argues that the EEOC told her that her September 27, 2004 EEOC complaint re-opened a prior complaint, and that she timely filed suit after receiving a right to sue letter on September 22, 2005. Plaintiff further contends that her Title VII hostile work environment claim is timely because she alleges that acts comprising the hostile work environment occurred within the limitations period.

An aggrieved person has 90 days to file suit after receiving a right to sue letter from the EEOC.  42 U.S.C. § 2000e-5(f)(1). Where, as here, plaintiff filed charges with a state agency, only discrete acts of alleged discrimination and retaliation occurring within 300 days of the date plaintiff filed charges with the EEOC are actionable.  National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, (2002).  "A charge alleging a hostile work environment claim, however, will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period."  Id. at 122.

There is insufficient evidence for a reasonable jury to find that the EEOC reopened plaintiff's first complaint, for which plaintiff received a right to sue letter on July 8, 2004.  There

29 - ORDER

is no evidence that the EEOC told plaintiff that it reopened her
initial complaint, as she contends.  The subsequent September 27,
2004 EEOC complaint form indicates that the earliest date the
discrimination took place is September 14, 2004, and that the
discrimination is ongoing.  Def's ex. 32.  The form does not
indicate that the EEOC reopened the prior application.

Discrete acts of discrimination alleged in and occurring
within 300 days prior to the September 27, 2004 BOLI and EEOC
complaint are not barred by Title VII's limitations period.  Nor
is a hostile work environment claim that encompasses at least one
act alleged in that administrative complaint to have occurred
within the limitations period.

2.  Chapter 659A of the Oregon Revised Statues

A BOLI complaint must be filed no later than one year after
an alleged unlawful practice.  Or. Rev. Stat. § 659A.820(1).  A
person who files a BOLI complaint must file a civil action within
90 days after a 90-day notice is mailed to the person.  Or. Rev.
Stat. § 659A.875(2).  The court finds no Oregon appellate court
opinions addressing the application of the limitations periods to
hostile work environment claims.  Federal cases interpreting
Title VII are instructive for claims under Or. Rev. Stat. §
659.030, the predecessor to Section 659A.030.  Mains v. II
Morrow, Inc., 877 P.2d 88, 93 (Or. App. 1994).  In the absence of
state court authority, the court applies the rule of Morgan to

30 - ORDER

plaintiff's state law hostile work environment claim.  Therefore, a state law hostile work environment claim is actionable if it encompasses an act alleged in plaintiff's September 27, 2004 administrative complaint that occurred within the one-year period prior to September 27, 2004.

      3.  42 U.S.C. § 1981

The parties dispute the period of limitations applicable to plaintiff's Section 1981 claim.  The four-year period specified in 28 U.S.C. § 1658 applies to plaintiff's Section 1981 claims of discrimination involving the conditions and terms of employment. Jones v. R.R. Connelley & Sons Co., 541 U.S. 369, 382-83 (2004). A Section 1981 hostile work environment claim is timely if one event comprising the environment is within the limitations period.  Shields v. Fort James Corp., 305 F.3d 1280, 1282-83 (11th Cir. 2002).

B.  Disparate Treatment

To establish a prima facie case under Title VII [and Section 1981], a plaintiff must offer proof: (1) that the plaintiff belongs to a [protected] class of persons . . .; (2) that the plaintiff performed his or her job satisfactorily; (3) that the plaintiff suffered an adverse employment action; and (4) that the plaintiff's employer treated the plaintiff differently than a similarly situated employee who does not belong to the same protected class as the plaintiff.

Establishing a prima facie case under [McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)] creates a presumption that the plaintiff's employer undertook the challenged employment action because of the plaintiff's race.  To rebut this presumption, the defendant must produce admissible evidence showing that the defendant

undertook the challenged employment action for a
legitimate, nondiscriminatory reason.  If the defendant
does so, then the presumption of discrimination drops
out of the picture and the plaintiff may defeat summary
judgment by satisfying the usual standard of proof
required in civil cases under Fed.R.Civ.P. 56(c).
[S]ummary judgment is not appropriate if, based on the
evidence in the record, a reasonable jury could
conclude by a preponderance of the evidence that the
defendant undertook the challenged employment action
because of the plaintiff's race.

Cornwell v. Electra Cent. Credit Union, 439 F.3d 1018, 1028-29

(9th Cir. 2006).  The same analysis applies to count 1 of

plaintiff's fourth claim alleging disparate treatment in

violation of Section 659A.030 of the Oregon Revised Statutes.

Williams v. Federal Express Corp., 211 F. Supp. 2d 1257, 1261 (D.

Or. 2002).

Defendant argues that plaintiff's evidence is insufficient

to create triable disputes of fact that her work was

satisfactory, or that defendant did not have a legitimate, non-

discriminatory reason for terminating plaintiff's employment.

Defendants produced evidence that HACSA initially extended

the probationary period and imposed work plans for legitimate

purposes - to foster compliance with the requirements of the

receptionist position regarding telephone usage, timeliness,

attendance and adherence to procedures.  Defendants also produced

evidence proving that it investigated plaintiff, placed plaintiff

on leave pending investigations, reprimanded plaintiff and

terminated plaintiff for legitimate concerns, including that

32 - ORDER

plaintiff was dishonest in her applications for employment and
during an investigation, improperly manipulated housing
application data, improperly and incorrectly informed an
applicant that the applicant was not eligible for housing, and
made comments to a client implying that HACSA may disfavor
certain racial minorities.

Plaintiff denies making a comment implying that HACSA is a
racist agency.  Her denial is contradicted by allegations of the
second amended complaint.  2nd Amend. Comp., ¶ 52.  Plaintiff's
response to HACSA's other concerns is that HACSA did not subject
Caucasian employees to the same standards regarding attendance,
timeliness and telephone usage, HACSA did not investigate other
employees who could have manipulated housing applicant data, and
HACSA favored student applicants and a terminally ill employee
applicant.  Plaintiff also points to workplace comments and
events she considers to be indicative of racial hostility, and to
testimony she says she heard from Todis that her termination "was
about race."[2]

To the extent the extended probationary period, work plans
investigations, administrative leave and termination may be
considered adverse employment actions, the court finds that

_____

[2]Plaintiff does not disclose the venue in which she heard
this testimony.  The court does not find the quoted language
among the deposition testimony of record, or the arbitrator's
November 7, 2005 written decision.

33 - ORDER

plaintiff's evidence is insufficient to create a triable issue of
fact that HACSA took the action against plaintiff because she is
Hispanic or of Mexican origin.  The front desk receptionist
position is reasonably subject to more stringent attendance,
timeliness and telephone usage requirements than other office
assistant positions.  Thus, plaintiff is not similarly situated
to employees not subject to identical requirements.  The record
contains evidence that HACSA suspected plaintiff of manipulating
housing applicant data.  Although the record does not disclose
precisely when HACSA officials first suspected plaintiff, there
is no evidence HACSA officials suspected any other employee.
That HACSA has a policy of favoring student applicants at the
Village Oaks location and provided housing to a terminally ill
employee does not demonstrate that HACSA treated plaintiff
differently because she is Hispanic or of Mexican origin.

    Significantly, plaintiff fails to provide context for
Todis's testimony.  Context is crucial, considering the evidence
that the final decision to hire plaintiff belonged to Todis, and
that one stated reason for plaintiff's discharge was her
disparaging remark implying that the agency may cancel an
application based on the applicant's race.  See Pl's ex. 12 [#91]
at 4 (Todis Depo. at 24).  Notably, plaintiff does not state she
heard Todis say she was terminated because of her race.

    The evidence that HACSA took action against plaintiff

34 - ORDER

because of her race is weak.  HACSA investigated plaintiff's
complaints about Bucholtz and counseled Bucholtz.  Assuming for
argument that HACSA failed to investigate or discipline
plaintiff's co-worker for referring to an infant as "chocolate,"
the failure has very little probative value regarding HACSA's
decisions to extend probation, conduct investigations, impose
work plans, and terminate employment.  The same is true of
Williams's pun and the proposed training scenario of a coworker
where a person of color is not pulling their weight, but a
supervisor does nothing for fear that the employee will "play the
race card."  Fields's alleged comment that a Hispanic
receptionist is needed to serve Hispanic clients is probative of
HACSA's alleged failure to let plaintiff apply for or transfer to
office assistant positions away from the desk.  The alleged
comment has little probative value on the question of whether
HACSA took other actions affecting plaintiff's employment because
of race.  The court finds that a reasonable juror could not
conclude that defendants extended plaintiff's probation, imposed
work plans, investigated plaintiff, or discharged plaintiff
because of her race.

The court further holds that disputed issues of fact
preclude summary judgment in favor of defendants on plaintiff's
Section 1981 claim that plaintiff was not allowed to transfer to
office assistant positions away from the reception area at the

Day Island Office because she is Hispanic.  This conclusion is based on (1) Fields's alleged comment to the effect that Hispanic clients need to see an Hispanic receptionist, (2) plaintiff's testimony that certain bilingual Caucasian employees were able to move from receptionist to other office assistant positions without applying for the positions and without loss of special compensation for speaking Spanish, and (3) plaintiff's testimony that she was threatened with the loss of such benefits if she left the receptionist position.  This claim is time-barred under Title VII and Section 659A.030 of the Oregon Revised Statutes.

C.  Retaliation

"To establish a prima facie case of retaliation, a plaintiff must demonstrate: (1) a protected activity; (2) an adverse employment action; and (3) a causal link between the protected activity and the adverse employment action."  Cornwell, 439 F.3d 1018, 1034-35 (9th Cir. 2006).  "As in disparate treatment actions, a retaliation plaintiff may use the McDonnell Douglas framework."  Id. at 1035 (internal citations and quotations omitted).

Defendant correctly points out that plaintiff's retaliation claims under Title VII and Chapter 659A are limited to her time at the Springfield office.  Defendant further argues that there is no evidence that plaintiff's BOLI and EEOC complaints resulted in her termination.

36 - ORDER

Plaintiff identifies allegedly protected activity and retaliatory conduct.  Plaintiff contends that the causal link between the protected activity and retaliatory conduct may be inferred from time.  The activities and conduct noted by plaintiff are listed below.  The conduct plaintiff attributes to defendant is indented.

> Co-workers placed "mopping" signs in the workplace. During a June 2, 2003 meeting, Fields told plaintiff, "don't you look at me that way."

On June 4, 2003, plaintiff went on medical leave for stress.

> Nine days later, Brett investigated plaintiff.

On June 23, 2003, plaintiff filed BOLI & EEOC complaints. On August 18, 2003, plaintiff's attorney sent a tort claim notice to Chris Todis and other county officials.

> On September 23, 2003, plaintiff was placed on administrative leave pending the results of Brett's investigation.  Plaintiff was transferred in October 2003.

Plaintiff complained to Demboski that Bucholtz referred to a Latino client as plaintiff's boyfriend, and that Bucholtz disfavored Latino clients.

> Though Bucholtz admitted referring to the client as plaintiff's boyfriend, Demboski nevertheless found the timing of plaintiff's complaint noteworthy.  Demboski wrote that plaintiff may be attempting to deflect recent concerns regarding her work performance.  Pl's ex. 17.

On August 3, 2003, plaintiff asked for a meeting with Demboski because Norma Riggs was digging through her garbage.

> A resulting investigation by Linda Norris led to a performance improvement plan for plaintiff dated September 20, 2004.

> Plaintiff filed BOLI and EEOC complaints in September 2004. Plaintiff went on medical leave in November 2004.
>
>> After being released to work on February 10, 2005, plaintiff was placed on administrative leave on February 11, 2005, and was terminated a few days later. Upon reinstatement in November 2005, plaintiff was immediately given a memorandum for expectations for return to work.

Pl's Memo. [#131] at 31-33.

To the extent plaintiff's various complaints constitute activity protected by state and federal anti-retaliation statutes, and to the extent defendant's actions are adverse employment actions, a reasonable juror could not conclude that defendant acted with retaliatory intent, rather than for the legitimate purposes noted above. Plaintiff has no direct evidence of defendant's retaliatory intent. In some cases, the proximity in time of an adverse employment action to protected activity permits an inference of retaliatory intent sufficient to survive a motion for summary judgment. Cornwell, 439 F.3d at 1035. Because of defendants' substantial evidence of legitimate reasons for actions against plaintiff, this is not such a case.

D. Hostile Work Environment

To prevail on her hostile workplace claim, plaintiff must prove she was subjected to unwelcome verbal or physical conduct of a racial nature sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment. Vasquez v. County of Los Angeles, 349 F.3d 634 (9th

38 - ORDER

Cir. 2003).  The court agrees with defendant that a reasonable jury could not conclude from the evidence that a reasonable Hispanic employee would find the conditions of the workplace altered by conduct of a racial nature.  Defendants are entitled to summary judgment on plaintiff's hostile work environment claims.

II.  42 U.S.C. § 1983

    A.  Limitations Defense

    A two-year limitations period applies to these claims.

    B.  Count 1 - Various Claims

        1.  Due Process

Plaintiff complains that she was discharged without adequate notice of charges and opportunity to respond, and in the absence of an adequate investigation.  Plaintiff received written notice of the charges on February 11, 2005, the same day of the event on which the charges are based.  Def's ex. 43.  It is undisputed that plaintiff chose to forego her opportunity to provide a response at the February 18, 2005 due process meeting.  The February 18, 2005 termination letter indicates that defendant interviewed witnesses to the event.  HACSA's decision not to interview the client involved in the incident is reasonable. Plaintiff's current argument that she did not make comments implying that HACSA disfavors minority groups does not somehow render the pre-termination investigation insufficient, as

39 - ORDER

plaintiff contends.   Further, this argument is contradicted by allegations of the second amended complaint that plaintiff made the comments.

Plaintiff claims that she was not permitted to provide her side of events while the events were fresh in her mind. Plaintiff had an opportunity to present her version of events at the due process meeting held one week after February 11, 2005. This opportunity to respond was not insufficient on account of its timing.

Plaintiff also appears to complain that she was placed on performance improvement plans and investigated without legitimate bases.   Plaintiff does not demonstrate that she had any property or liberty interest in freedom from work improvement plans or investigations.   As noted, there is evidence justifying the work plans and investigations.

Plaintiff also complains that defendant made up reasons for terminating plaintiff after the fact, and presented those reasons to the arbitrator.   Plaintiff does not state the additional reasons, and does not indicate whether the arbitrator relied on them in converting the termination to a ten-day suspension without pay.   The arbitrator limited the hearing to charges contained in the notice of proposed discipline.   Def's ex. 54 at 18.   The court agrees with the arbitrator that the investigation, notice of proposed discipline and due process meeting satisfied

40 - ORDER

the core due process requirements of pre-deprivation notice and opportunity for comment.  Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 544-45 (1985).

      2.  Equal Protection

      Defendant contends there is no basis for municipal liability on this claim.  Municipal liability may be established by official policy or custom, policymaker action, or ratification by a policy maker.  Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1996).

      Plaintiff argues that County Commissioners violated her confidentiality by reporting her complaint to Todis, and that by doing so, the commissioners treated plaintiff differently than similarly situated employees.  Plaintiff's logic is faulty. There is no evidence commissioners treated plaintiff differently than similarly situated employees outside the protected class.

      Plaintiff argues that Todis ratified the actions of his subordinates in transferring and terminating plaintiff.  As noted, the court finds that a reasonable juror could not conclude that plaintiff was terminated because of her race.  Plaintiff's claim that she was denied equal protection in her transfer to the Fairview office is time-barred.

      Last, plaintiff argues that department policymakers violated her equal protection rights by not correcting her disciplinary record.  Plaintiff identifies no policymaker who allegedly failed

41 - ORDER

to correct plaintiff's disciplinary record.  Plaintiff provides
no evidence of a policy, custom or practice of failing to correct
disciplinary records.  HACSA and Lane County are entitled to
summary judgment on this count.

### 3.  Fourth Amendment

Plaintiff complains that Norma Riggs's "search" of
plaintiff's trash and recycling vessels violates plaintiff's
Fourth Amendment rights.  Plaintiff does not have a reasonable
expectation of privacy in trash and recycling containers located
in the front desk area.  Cf. O'Connor v. Ortega, 480 U.S. 709
(1987) (public employee had reasonable expectation of privacy in
office desk).

### 4.  Thirteenth Amendment

The second amended complaint lacks sufficient allegations to
state a claim for involuntary servitude, and there is no evidence
to support such a claim.  See United States v. Kozminski, 487
U.S. 931, 948 (1988).

### C.  Count 2 - 1st Amendment Retaliation

Defendant argues that this claim is precluded by the
arbitrator's holding that plaintiff's speech is not protected,
and that plaintiff's speech is not entitled to First Amendment
protection.  Arbitral decisions do not have preclusive effect on
Section 1983 claims.  McDonald v. City of West Branch, Mich., 466
U.S. 284, 292 (1984).

Despite contrary allegations in the second amended complaint, plaintiff now denies making statements that "'Afro-Americans and 'Latinos' were cancelled more often than Caucasian applicants." Compare 2nd Amend. Comp., ¶ 52, with Pl's Memo. at 20. Instead, she argues she was punished for complaining about union election campaign posters, fourth amendment violations regarding her garbage and recycling and HACSA's failure to comply with arbitration decisions. Id. at 50. As discussed above, the court finds that a reasonable juror could not conclude that defendant took actions against plaintiff with a retaliatory motive.

D. Count 3 - Equal Protection

Plaintiff's "class of one" equal protection claim fails as a matter of law. Engquist v. Oregon Dept. of Agriculture, 478 F.3d 985 (9th Cir. 2007).

E. Counts 4, 5 & 6 - Individual Liability

The only constitutional tort alleged against the individual defendants which could possibly survive summary judgment on the merits is an equal protection claim for denial of plaintiff's alleged requests to transfer to office assistant positions away from the front desk at the Day Island office. Such a claim is time-barred, however.

III. Oregon Family Leave Act

Count four of the fourth claim for relief alleges that

43 - ORDER

"[p]laintiff was discriminated against in the allowance of
medical leave by HACSA and Lane County and was retaliated against
for taking medical leave . . ." in violation of the Oregon Family
Leave Act (OFLA).  2nd Amend. Comp., ¶ 92.  Plaintiff argues that
defendants interfered with her medical leave by conducting
investigations during the period of leave.  Plaintiff further
argues and that the first time she returned from leave, HACSA
placed her on administrative leave and thereafter transferred her
to a work location in another town and imposed a work improvement
plan.  Plaintiff finally argues that shortly after she returned
from a second medical leave, HACSA terminated her employment.

OFLA does not prohibit defendants from investigating
plaintiff, placing her on administrative leave, or subjecting her
to work improvement plans.  Or. Rev. Stat. § 659A.171(3)(b).  The
Oregon legislature has not created a statutory cause of action
for retaliation for pursuit of rights accorded by OFLA.  See e.g.
Mesa v. Tovin, 2007 WL 283032 (D. Or.), Stewart v. Sears, Roebuck
and CO., 2005 WL 5142285 (D. Or.); but see Yeager v. Providence
Health System Oregon, 96 P.3d 862, (Or. App. 2004).

IV.  Oregon Whistleblower Claim

The same standards apply to claims under the Oregon
Whistleblower Act and Title VII retaliation claims.  Clarke v.
Multnomah County, 2007 WL 915175, *14 (D. Or.).  A reasonable
juror could not conclude that defendants subjected plaintiff to

44 - ORDER

the adverse employment actions because plaintiff engaged in the
protected activity, rather than for the legitimate purposes
discussed above.

V.  Claims for Infliction of Emotional Distress

Defendants' alleged conduct is not sufficiently outrageous
to state a claim for infliction of emotional distress.

VI.  Wrongful Discharge

Defendant argues that plaintiff's wrongful discharge claim
is precluded by the arbitrator's decision.  The second amended
complaint does not allege specific conduct leading to plaintiff's
discharge.  In her memorandum, plaintiff contends that her
complaints regarding the various constitutional and statutory
violations alleged in this lawsuit (other than discharge for
plaintiff's speech with a client) formed the basis for her
discharge.  Pl's Memo. at 60.  To the extent this claim is not
precluded by the arbitration decision, see Shuler v. Distribution
Trucking, Co., 994 P.2d 167, 172 (Or. App. 1999), or plaintiff's
Section 1981 and Section 1983 claims, see Henry v. Portland Dev.
Comm'n, 2006 WL 4008709 (D. Or.), it fails the same as
plaintiff's other retaliation claims.  A reasonable juror could
not conclude that plaintiff was discharged for her complaints of
"various violations," rather than for the charges identified in
the February 11, 2005 notice of proposed disciplinary action.
See Def's ex. 43.

45 - ORDER

To the extent plaintiff unsuccessfully sought to transfer to office assistant positions away from the front desk within four years of filing the complaint, plaintiff's second claim under Section 1981 survives defendants' motion for summary judgment. Defendants are entitled to summary judgment on the remaining claims.

<u>Conclusion</u>

Based on the foregoing, plaintiff's motion to strike [#75] is denied; defendant's motion for summary judgment [#54] is granted in part and denied in part.

IT IS SO ORDERED.

DATED this __16TH__ day of August, 2007.


        s/ Michael R. Hogan
        United States District Judge

46 - ORDER